UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In Re:<br><br>PHILIP G. BARRY<br>a/k/a BARRY PUBLICATIONS,<br><br>                     Debtor. | Chapter 11<br><br>Case No. 08-47352 (dem) |
| FRANCES MONTELEONE, LINDA RODRIGUEZ, ELYSE SCILEPPI, FRANK J. MONTELEONE, WENDY MONTELEONE, MARGRET SCHAEFER BARGLOW, RAYMOND BARGLOW, PAMELA MONTANARO, SIRI SCULL, CHARLES SCULL, ROBERT WOLFSON, MAHALIA PUGATCH, GENE BIANCO, and ANITA BIANCO,<br><br>                     Plaintiffs,<br><br>v.<br><br>PHILIP G. BARRY<br>a/k/a BARRY PUBLICATIONS,<br><br>                     Defendant. | Adversary No. |

**COMPLAINT TO DETERMINE DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. § 523**

Plaintiffs, Frances Monteleone ("F. Monteleone"), Linda Rodriguez ("Rodriguez"), Elyse

Scileppi ("Scileppi"), Frank J. Monteleone ("F.J. Monteleone") Wendy Monteleone ("W.

Monteleone"), Margret Schaefer Barglow ("M. Barglow"), Raymond Barglow ("R. Barglow"),

Pamela Montanaro ("Montanaro"), Siri Scull ("S. Scull"), Charles Scull ("C. Scull"), Robert

Wolfson ("Wolfson"), Mahalia Pugatch ("Pugatch"), Gene Bianco ("G. Bianco"), Anita Bianco

("A. Bianco") (collectively, the "Plaintiffs" or "Monteleone Creditors"), by way of Complaint against Defendant, the Debtor, Philip G. Barry a/k/a Barry Publications ("Barry"), aver as follows:

**JURISDICTION AND VENUE**

1.      On October 31, 2008 (the "Petition Date"), the Debtor[1] filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), under Case No. 08-47352 -dem (the "Individual Bankruptcy Case").

2.      On November 20, 2008, Philip Barry, LLC, a limited liability company of which the Debtor is the sole member, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court, bearing Case No. 1-08-47899-dem (the "Corporate Bankruptcy Case").  The Corporate Bankruptcy Case was dismissed by the Bankruptcy Court on January 21, 2009.

3.      This Court has jurisdiction of this adversary proceeding pursuant to, *inter alia*, 28 U.S.C. § 1334, Federal Rules of Bankruptcy Procedure 4004(a), 4007 and 7001(6), and 11 U.S.C. §§ 523 and 105(a).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(2)(I).

4.      Venue of this adversary proceeding in this judicial district is appropriate pursuant to 28 U.S.C. § 1409(a), as this proceeding arises in or is related to a case arising under Title 11, which is presently venued in this district as set forth above.

---

[1] The Debtor in this case appears, *pro se*, as Philip G. Barry a/k/a Barry Publications.  If, in fact, Barry Publications is a legally separate entity existing under the laws of the State of New York, or any other jurisdiction, then to the extent that the Debtor intends Barry Publications to be a debtor in bankruptcy, such *pro se* representation is not permitted under the laws of this jurisdiction.

2

## PARTIES

### A.    The Plaintiffs

5.    Plaintiff, M. Barglow, is an individual who is a California citizen and resides at 1 Quail Avenue, Berkeley, California, 94708.  M. Barglow is the sister-in-law of R. Barglow.

6.    Plaintiff R. Barglow, is an individual who is a California citizen and resides at 1138 Keith Avenue, Berkeley, California, 94708.  R. Barglow is husband of Montanaro and the brother-in-law of M. Barglow.

7.    Plaintiff Montanaro, is an individual who is a California citizen and resides at 1138 Keith Avenue, Berkeley, California, 94708.  Montanaro is the wife of R. Barglow.

8.    Plaintiff S. Scull, is an individual who is a California citizen and resides at 1482 La Playa, San Francisco, California, 94122.  S. Scull is the daughter of C. Scull.

9.    Plaintiff C. Scull, is an individual who is a California citizen and resides at 909 W. California Avenue, Mill Valley, California, 94941.  C. Scull is the father of S. Scull.

10.    Plaintiff Wolfson, is an individual who is a California citizen and resides at 79 Woodland Road, Fairfax, California, 94930.  Wolfson is the husband of Pugatch.

11.    Plaintiff Pugatch, is an individual who is a California citizen and resides at 79 Woodland Road, Fairfax, California, 94930.  Pugatch is the wife of Wolfson.

12.    Plaintiff, F. Monteleone, is an individual who is a New Jersey citizen and resides at 402 Chestnut Street, Township of Washington, New Jersey 07676.

13.    Plaintiff Rodriguez, is an individual who is a New Jersey citizen and resides at 3 Marsh Hawk, Hackettstown, New Jersey 07840.  Rodriguez is F. Monteleone's sister.

14.    Plaintiff Scileppi, is an individual who is a Minnesota citizen and resides at 2804 2nd Street, SW, Rochester Minnesota 55902.  Scileppi is the daughter of F. Monteleone.

15.     Plaintiff F.J. Monteleone, is an individual who is a Tennessee citizen and resides at 9496 Hedgegrove Cove, Germantown, Tennessee 38139.  F.J. Monteleone is the brother of F. Monteleone and Rodriguez.

16.     Plaintiff W. Monteleone, is an individual who is a Tennessee citizen and resides at 9496 Hedgegrove Cove, Germantown, Tennessee 38139.  W. Monteleone is married to F.J. Monteleone.

17.     Plaintiff A. Bianco is an individual who is a California citizen and resides at 1182 Via Fresno, Cathedral City, California 92234.

18.     Plaintiff G. Bianco is an individual who is a Vermont citizen and resides at 4114 Braintree Hill Rd, Braintree, Vermont 05060.  G. Bianco is A. Bianco's son.

**B.     The Defendant**

19.     Upon information and belief, Defendant, Philip G. Barry a/k/a Barry Publications, is a citizen of the State of New York and resides at 477A- 82nd Street, Brooklyn, New York 11209.

**C.     Non-Defendant Related Parties**

20.     Upon information and belief, The Leverage Group ("Leverage Group") is a New York entity with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

21.     Upon information and belief, Leverage Option Management Co., Inc. ("Leverage Option Management") is a New York corporation with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

22.    Upon information and belief North American Financial ("North American") is a New York entity with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

23.    Upon information and belief, Leverage Management, LLC ("Leverage Management"), is a New York limited liability company with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

24.    Upon information and belief, Lake Joseph Development Corp. ("Lake Joseph"), is a New York corporation with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

25.    Upon information and belief, Saint Josephs Development Corporation ("St. Josephs"), is a New York corporation with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

26.    Upon information and belief, HK Holdings, LLC ("HK Holdings"), is a New York limited liability company with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

27.    Upon information and belief, Philip Barry, LLC ("Barry, LLC"), is a New York limited liability company with its principal place of business at 477A- 82nd Street, Brooklyn, New York, 11209.

28.    Upon information and belief, Barry is a principal, officer, director, or otherwise holds an interest in the foregoing non-Defendant related parties.  Although these non-Defendant related parties are defendants in the various District Court actions, which are described in further detail herein, they are not debtors in this Bankruptcy Case, and not defendants in this adversary

proceeding.  These Non-Defendant Related Parties may be collectively referred to herein as the "Related Entities."

<u>**FACTUAL BACKGROUND**</u>

29.    On May 14, 2008, *Monteleone, et al. v. Leverage Group, et al.*, 08-cv-1986 was filed in the United States District Court.  Other suits followed: *Barglow, et al. v. Leverage Group, et al.*, 08-2131, filed May 27, 2008; and *Bianco, et al v. Leverage Group, et al.*, 08-3033, filed July 23, 2008.

30.    On November 17, 2008 and December 18, 2008, the District Court consolidated the cases listed above, among others, and instructed Plaintiffs to file a consolidated Complaint.

A.    ***Barglow v. The Leverage Group, Case No. 08-2131***

31.    In or about February of 2008, M. Barglow, was referred to Barry to invest her money with him and his companies, the Leverage Group, Leverage Option Management, Leverage Management, LLC, North American, Barry, LLC, Leverage Management, LLC, Saint Joseph's Development Corporation, and HK Holdings, LLC.

32.    Defendant Barry represented that in return for her investment that M. Barglow would receive interest at a rate of 12.55% on her investment.

33.    M. Barglow opened her account with the Leverage Group (account number 2-061-08) in February 2008 by making an initial deposit of Fifty Thousand Dollars ($50,000). Upon opening this account, M. Barglow received a letter dated February 6, 2008, from Barry indicating that her opening deposit had been received and she would receive interest at a rate of 12.55% on her investment.

34.     In April of 2008, M. Barglow sent another deposit of Fifty Thousand Dollars ($50,000) to be deposited into account 2-061-08. Barry acknowledged receipt of the funds by sending M. Barglow an email dated April 9, 2008.

35.     Upon learning of other legal action involving Defendant and the Related Entities, on May 19, 2008, M. Barglow sent a letter via both Federal Express and email to Defendant and the Related Entities formally requesting that all of her funds from Defendant and the Related Entities be returned to her by May 22, 2008.

36.     Defendant and the Related Entities have refused to return M. Barglow's funds to her as requested.

37.     In or about February 2008, M. Barglow's brother-in-law, R. Barglow, and his wife Montanaro, opened their account with Leverage Group (account number 2-201-08) by making an initial deposit of Fifty Thousand and Ten Dollars ($50,010.00).

38.     Defendant Barry represented that in return for their investment that R. Barglow and Montanaro would receive interest at a rate of 12.55% on their investment.

39.     With additional interest, R. Barglow and Montanaro's account contained Fifty Thousand Six Hundred and Seventy Six Dollars and Thirteen Cents ($50,676.13) by the quarterly statement ending March 31, 2008.

40.     On April 15, 2008, R. Barglow and Montanaro made an additional deposit to Defendant and the Related Entities in the amount of One Hundred Thousand Dollars ($100,000) for account 2-201-08. Defendant and the Related Entities acknowledged receipt of this deposit by stamping "Received" on the deposit ticket dated April 15, 2008.

41.     Upon learning of other legal action involving Defendant and the Related Entities, on May 16, 2008, R. Barglow and Montanaro sent a fax and an email to Defendant and the

Related Entities formally requesting that all of their funds from Defendant and the Related Entities be returned to them by May 19, 2008.

42.    After receiving no response from Defendant and the Related Entities regarding the May 16, 2008 fax and email, R. Barglow and Montanaro sent a letter to Defendant and the Related Entities via registered mail and email on May 19, 2008, again requesting the return of their funds.

43.    Defendant and the Related Entities have refused to return R. Barglow and Montanaro's funds to them as requested.

44.    In early 2007, C. Scull, opened his account with Leverage Group (account number 2-141-07) by making an initial deposit of Fifty Thousand Dollars ($50,000).

45.    Defendant Barry represented that in return for his investment that C. Scull would receive interest at a rate of 12.55% on his investment.

46.    In May 2008, C. Scull opened an additional account with Leverage Group (account 5-021-08) by making an initial deposit of Sixty Thousand Dollars ($60,000).

47.    Also in May 2008, C. Scull made an additional deposit into account 2-141-07 in the amount of Fifty Thousand Dollars ($50,000).

48.    In May 2008, C. Scull received a letter from Barry indicating that as of May 16, 2008, account 2-141-07 had a balance of One Hundred Eight Thousand, Two Hundred and Twenty Five Dollars ($108,225) including all interest and deposits.

49.    In May 2008, C. Scull also received a letter concerning account 5-021-08, in which Barry indicated that as of May 16, 2008, that account had a balance of Sixty Thousand, Nine Hundred and Eighteen Dollars ($60,918.00) including all interest and deposits.

50.    Upon learning of other legal action involving Defendant and the Related Entities, on May 19, 2008, C. Scull contacted Defendant and the Related Entities via email and requested that all of his funds from Defendant and the Related Entities be returned to him by May 22.2008.

51.    Defendant and the Related Entities have refused to return C. Scull's funds to him as requested.

52.    C. Scull's daughter, S. Scull, opened her account with the Leverage Group (account number 5-051-08) in May of 2008, by making an initial deposit of One Hundred Thousand Dollars ($100,000).  Upon opening this account, S. Scull received a letter dated May 5, 2008, from Barry indicating that her opening deposit had been received and she would receive interest at a rate of 12.55% on her investment.

53.    Upon learning of other legal action involving Defendant and the Related Entities, on May 17, 2008, S. Scull sent an email to Defendant and the Related Entities formally requesting that all of her funds be returned to her by May 19, 2008.

54.    In addition, S. Scull called Defendant Barry on May 19, 2008, to request the return of her funds.  Defendant Barry refused to immediately return S. Scull's funds as requested.

55.    In or about February 2007, Wolfson and his wife Pugatch, opened their account with Leverage Group (account number 2-013-07) by making an initial deposit of Thirty Five Thousand Dollars ($35,000).

56.    Upon opening this account, Wolfson and Pugatch received a letter dated February 1, 2008, from Barry indicating that their opening deposit had been received and that they would receive interest at a rate of 12.55% on their investment.

57.     With additional interest, Wolfson and Pugatch's account contained Thirty Nine Thousand Ten Dollars and Thirty Five Cents ($39.010.35) by the quarterly statement ending December 31, 2007.

58.     On February 28, 2008, Barry contacted Wolfson and made him an offer in which Barry would take Thirty Seven Thousand Five Hundred Dollars ($37,500) out of Wolfson and Pugatch's account 2-013-07 and place it in an account which would receive 24% interest instead of the 12.55% interest rate applicable to account 2-013-07.  Wolfson agreed and provided an additional Nine Thousand Dollars ($9,000) cash to accompany the $37,500 transfer, for a total of Forty Six Thousand, Five Hundred Dollars ($46,500) which was placed into account 2-289-09B. Barry indicated to Wolfson that this money would not mature until February 28, 2009 and therefore, placed that date on the deposit ticket.

59.     With additional deposits and interest, Wolfson and Pugatch's  account 2-013-07 contained Ninety Three Thousand, Nine Hundred and Twenty Six Dollars, and Twenty Two Cents ($93,926.22) by the quarterly statement ending March 31, 2008.  This statement also lists the withdraw transfer of Thirty Seven Thousand and Five Hundred Dollars ($37,500) removed from the account in order to open the higher interest bearing account 2-289-09B mentioned above.

60.     Upon learning of other legal action involving Defendant and the Related Entities, on May 15, 2008, Wolfson and Pugatch sent an email to Defendant and the Related Entities formally requesting that all of their funds be returned to them by May 20, 2008.

61.     Defendant and the Related Entities have refused to return Wolfson and Pugatch's funds to them as they requested.

**B.**    *Monteleone v. The Leverage Group, Case No. 08-1986*

62.    In or about late 2002, F. Monteleone, was referred to Philip Barry to invest her money with him and his companies, the Leverage Group, Leverage Option Management, North American, Leverage Management, LLC, Barry, LLC, Saint Joseph's Development Corporation, and HK Holdings, LLC.

63.    Defendant Barry represented that in return for her investment that F. Monteleone would receive interest at a rate of 12.55% on her investment.  F. Monteleone received quarterly statements regarding her investment indicating that she would receive 12.55% interest on her investment.

64.    F. Monteleone opened her account with the Leverage Group (account number 10-252-02) in October 2002 by making an initial deposit of Fifteen Thousand Dollars ($15,000).

65.    F. Monteleone received a statement from the Defendant and the Related Entities in December 2002 that her Leverage Account would earn 12.55% for calendar year 2003.

66.    With additional deposits and interest, F. Monteleone's account contained $181,575.38 by the quarterly statement ending March 31, 2003.

67.    According to her quarterly statement from the Leverage Group, as of September 30, 2007,  F. Monteleone's account (10-252-02) contained $371,815.97.

68.    In December 2007, F. Monteleone received a letter from Defendant and the Related Entities stating "[w]e will soon enter our 30th year with one of the most consistent records in the investment management business. We look forward to again earning for you: 12.55% minimum effective annual yield for calendar year 2008.

69.    On January 18, 2008, F. Monteleone sent a letter to Defendant and the Related Entities formally requesting that all of her funds from Defendant and the Related Entities totaling

$382,967.46 as of December 31, 2007 for account number 10-252-02 be returned to her immediately.

70.    Defendant and the Related Entities have refused to return F. Monteleone's funds to her as she has requested.

71.    In or about April 2003, F. Monteleone's daughter, Scileppi, provided $3,000 to Defendant and the Related Entities (account number 4-182-03).  Confirmation of this deposit was provided by letter dated April 18, 2003.

72.    With additional interest, Scileppi's account contained $5,075.57 by the quarterly statement ending September 30, 2007.

73.    F.J. and Wendy Monteleone opened their account with the Leverage Group (account number 6-062-03) in June 2003 by making an initial deposit of Twenty Thousand Dollars ($20,000).

74.    F.J. and Wendy Monteleone received a statement from the Defendant and the Related Entities in June 2003 that their Leverage Account would earn 12.55% for calendar year 2003.

75.    With additional deposits and interest, F.J. Monteleone's account contained $137,410.06 by the quarterly statement ending December 31, 2007.

76.    F.J. and Wendy Monteleone also opened accounts for their children Lila E. Monteleone and Frank D. Monteleone.  Their children are both minors.

77.    With deposits and interest, Frank D. Monteleone's account (3-011-01) contained $18,870.69 and Lila E. Monteleone's account (10-251-02) contained $18,740.32 by the quarterly statement ending December 31, 2007.

78.     According to her quarterly statement from the Leverage Group, as of June 30, 2007,  Linda Rodriguez' account (7-012-02) contained $4,736.14.

**C.     *Bianco v. The Leverage Group, Case No. 08-3033***

79.     In or about March 2005, G. Bianco and A. Bianco were referred to Philip Barry to invest their money with him and his companies, the Leverage Group, Leverage Option Management, North American, Leverage Management, LLC, Barry, LLC, Saint Joseph's Development Corporation, and HK Holdings, LLC.

80.     Defendant Barry represented that in return for their investment, G. Bianco and A. Bianco would receive interest at a rate of 12.55%.  G. Bianco and A. Bianco also received quarterly statements indicating that they would receive 12.55% interest on their investment.

81.     G. Bianco and A. Bianco opened their first account with the Leverage Group (account number 2-101-05) in or about March 2005 by making an initial deposit of Ten Thousand Dollars ($10,000).

82.     Over the next two years, A. Bianco continued to make deposits into account number 2-101-05, jointly held by her and G. Bianco.

83.     By December 31, 2007, that account had a closing balance of $295,595.56.

84.     A. Bianco made an initial deposit of Thirty Thousand Five Hundred Dollars ($30,500) into a second account held jointly by her and G. Bianco, account number 10-232-06, in October 2006.

85.     A. Bianco subsequently deposited Fifteen Thousand Two Hundred Dollars ($15,200) into account 10-232-06 on January 12, 2007.

86.     On July 3, 2008, G. Bianco sent a letter to Defendant and the Related Entities formally requesting that all of his and his mother's funds deposited with Defendant and the

13

Related Entities, totaling $349,268.90 as of July 3, 2008 for accounts numbered 2-101-05 and 10-232-06, be returned to him and A. Bianco immediately.

87.    Defendant and the Related Entities have refused to return G. Bianco's and A. Bianco's funds to them as G. Bianco has requested.

### COUNT I
**(Violation of Federal Securities Laws)**

88.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

89.    The options in which Defendant and the Related Entities traded or purported to trade on Plaintiffs' behalf are a "security" or "securities" within the meaning of Sections 3(a)(10) and 10(b) of the Securities Exchange Act, 15 U.S.C. §§ 78c(a)(l0), 78j(b), and S.E.C. Rule l0b-5.

90.    Defendant and the Related Entities, directly and indirectly, singly and in concert, knowingly or recklessly, by use of the means and instrumentality of interstate commerce or of the mails, in the offer or sale, and in connection with the purchase or sale, of securities, have *inter alia* (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchases of securities.

91.    In furtherance of this conduct, Defendant and the Related Entities have made several misrepresentations, including but not limited to the following:

    a.    that Barry was a professional investment manager with a successful track record in managing investments for individuals;

    b.    that the firm's successful track record dated back to approximately 1977;

c.      that the firm had one of the best performance records in the investment management business;

d.      that the Leverage Defendant and the Related Entities had consistently earned annual returns of between 12.55% and 36% for its investors;

e.      that investments in the Leverage entities would be "safe";

f.      that investments in the Leverage entities would earn a guaranteed minimum annual return of 12.55% or in some instances 36%;

g.      that interest income would be paid quarterly;

h.      that funds invested in the Leverage entities would be held in a segregated account for each investor;

i.      that investors would receive quarterly statements evidencing the change in their account over the quarter; and

j.      that investors in the Leverage entities would be able to liquidate their account upon request.

92.     These representations were material, and the Defendant and the Related Entities knew or should have known that the material misrepresentations were false or misleading.

93.     By reason of the acts, omissions, practices and courses of business set forth in this Complaint, the Defendant and the Related Entities have violated the securities laws of the United States, including but not limited to, Sections 3(a)(10) and 10(b) of the Securities Exchange Act, 15 U.S.C. §§ 78c(a)(l0), 78j(b), and S.E.C. Rule l0b-5.

94.     Plaintiffs reasonably relied on Defendant's and the Related Entities' misrepresentations regarding the Leverage Defendant and the Related Entities in deciding to invest their funds.

95.     As a result of the foregoing, Plaintiffs have sustained substantial damages that exceed $12 million, and have been irreparably harmed thereby.

## COUNT II
### (Violation of New Jersey Securities Laws - N.J.S.A. 49:3-710)

96.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

97.     By reasons of the acts, misrepresentations, omissions and courses of business previously set forth in this Complaint, the Defendant and the Related Entities have violated the Securities Laws of the State of New Jersey as set forth in N.J.S.A. 49:3-71 (New Jersey's adoption of the Uniform Securities Act).

98.     Plaintiffs reasonably relied on Defendant's and the Related Entities' misrepresentations regarding Leverage in deciding to invest their funds.

99.     As a result of the foregoing Plaintiffs have sustained substantial damages and have been irreparably harmed thereby.

## COUNT III
### (Federal RICO - Violation of 18 U.S.C. § 1962(c))

100.     Plaintiffs reassert and reallege the foregoing allegations as if fully set forth herein.

101.     At all times relevant to this complaint all Defendant and the Related Entities were "persons" within the meaning of 18 U.S.C. section 1961(3).

102.     At all times relevant to this complaint, the Defendant and Leverage Option Management, North American, Leverage Management, St. Joseph's, and HK Holdings (the "RICO Defendants") directly or indirectly maintained an interest in or participated in the operation of the Leverage Group, which is an "enterprise" within the meaning of 18 U.S.C. section 1961(4).

103.     As set forth more fully above, the foregoing RICO Defendants corrupted the Leverage Group and caused Plaintiffs damage through a pattern of racketeering activity.  At all

times relevant to this complaint, the foregoing RICO Defendants conducted or participated, directly or indirectly, in the operation and management of the Leverage Group through a pattern of racketeering activity within the meaning of 18 U.S.C. section 1961(1) and (5) and section 1962 (c). This pattern of racketeering activity entailed at least two predicate acts of racketeering activity by the foregoing RICO Defendants.

104.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under 18 U.S.C. sections 1341, 1343 and 1346 and are within the scope of 18 U.S.C. sections 1961(a)(A) and (1)(B). As set out more fully herein, the commission of at least two of those related predicate acts over the last 10 years constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. sections 161(1) and (5).

105.    As part of and in furtherance of the fraudulent schemes and artifices described aforesaid, the RICO Defendants made repeated use of, or had reason to believe that others would use, the U.S. Postal Service, interstate overnight couriers, and the interstate wires to transmit various documents, including without limitation the Quarterly Statements, contracts, letters and investment-deposit checks referenced above (the "Transmissions").

106.    Each Transmission constituted either the transmittal by means of wire communication in interstate commerce of signals, sounds or writings; the use of the U.S. Postal service; or the use of interstate overnight couriers for the purpose of executing or in connection with the aforementioned schemes and artifices to defraud. The foregoing RICO Defendants knew or had reason to believe that these Transmissions were in furtherance of advancing the aforesaid corrupt enterprise or were incidental to an essential part of the aforesaid corrupt enterprise.

107.    The RICO Defendants made or caused these Transmissions to be made with the specific intent of defrauding Plaintiffs and other investors and potential investors in the Leverage Group. Each of these Transmissions furthered the aforementioned schemes and artifices to defraud, which were intended to and did proximately cause injury to Plaintiffs and others in their business and property. Those acts constituted offenses indictable as crimes under, the "mail fraud" and "wire fraud" statutes, 18 U.S.C. sections 1341, 1343 and 1346.

108.    Plaintiffs reasonably relied upon the oral and written statements made to them by the foregoing RICO Defendants in connection with the aforementioned schemes or artifices to defraud.

109.    As a result of the foregoing, Plaintiffs have sustained substantial damages and/or irreparable harm.

**COUNT IV**
**(Federal RICO Conspiracy - Violation of 18 U.S.C. § 1962(d))**

110.    Plaintiffs repeat and reallege the foregoing allegations as if the same were fully set forth at length herein.

111.    Since at least 1988 through and including the present, the RICO Defendants unlawfully and willfully combined, conspired, confederated and agreed between and among each other to violate 18 USC section 1962(c), i.e. to conduct and participate, directly and indirectly, in the affairs of the Leverage Group through a pattern of racketeering, all in violation of 18 USC section 1962(d).

112.    As part of this conspiracy, each of the foregoing RICO Defendants personally agreed to commit and in fact committed two or more predicate racketeering acts within the last 10 years and agreed to conduct and in fact conducted the affairs of the Leverage Group through a pattern of racketeering activity in violation of 18 USC section 1962(c).

113.    As a result of the foregoing, Plaintiffs have sustained substantial damages and have been irreparably harmed.

**COUNT V**
**(New Jersey RICO - Violation of N.J.S.A 2C:41-2(c))**

114.    Plaintiffs repeat the foregoing allegations as if fully set forth herein.

115.    The Defendant and the Related Entities are persons as defined by N.J.S.A. 2C:41-l(b).

116.    The aforesaid acts of the Defendant and the Related Entities in making fraudulent statements to Plaintiffs in order to induce Plaintiffs to invest with them and then not return Plaintiffs' investments or to pay all applicable interest promised constitutes an enterprise as set forth in N.J.S.A. 2C:4l-l.

117.    The Defendant and the Related Entities have engaged in at least two incidents of racketeering conduct one of which occurred after the effective date of the racketeering statute and the last of which has occurred within 10 years of a prior racketeering activity.

118.    The incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, participants or victims or methods of commission or are otherwise, interrelated by distinguishing characteristics are not isolated incidents.

119.    The Defendant and the Related Entities racketeering activity embraces the following crimes which are crimes under the laws of New Jersey or are equivalent crimes under the laws of any other jurisdiction:

    i.    Theft by Deception;

    ii.    Fraud in the offering, sale or purchase of securities.

120.    As a result of the foregoing violations of the New Jersey Rico Statute, Plaintiffs has sustained substantial damages and imminent and irreparable harm.

<u>**COUNT VI**</u>
**(Conspiracy to Violate New Jersey RICO - N.J.S.A. 2C:41-2(d))**

121.    Plaintiffs repeat the foregoing allegations as if fully set forth herein.

122.    The Defendant and the Related Entities engaged in the aforesaid, corrupt

enterprise in order to defraud the Plaintiffs of their rightful investment and earned interest.

123.    The Defendant and the Related Entities conspired to violate N.J.S.A. 2C:4l-2(c)

by agreeing to conduct or participate in the affairs of the corrupt enterprise and further agreed to

commit at least two predicate acts.

124.    As a result of the aforesaid conspiracy, the Plaintiffs have sustained substantial

damages and imminent and irreparable harm.

<u>**COUNT VII**</u>
**(Common Law Fraud)**

125.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

126.    Defendant and the Related Entities made numerous false and misleading

statements to Plaintiffs, both orally and in writing.  These false and misleading statements upon

which Defendant's expected Plaintiffs to rely, include, but are not limited to the following:

    a.    that Barry was a professional investment manager with a successful track
record in managing investments for individuals;

    b.    that the firm's successful track record dated back to approximately 1977;

    c.    that the firm had one of the best performance records in the investment
management business;

    d.    that the Leverage entities had consistently earned annual returns of
between 12.55% and 36% for its investors;

    e.    that investments in the Leverage entities would be "safe";

f.   that investments in the Leverage entities would earn a guaranteed minimum annual returns of at least 12.55% and in other instances 3% per month or 36% per annum;

g.   that interest income would be paid quarterly;

h.   that funds invested in the Leverage entities would be held in a segregated account for each investor;

i.   that investors would receive quarterly statements evidencing the change in their account over the quarter; and

j.   that investors in the Leverage entities would be able to liquidate their account upon request.

127.   Additionally, upon information and belief, Defendant and the Related Entities, fraudulently converted Plaintiffs' funds and used them to purchase numerous properties in Sullivan County, New York and other New York locations.

128.   Defendant and the Related Entities acted with the intention to deceive and mislead the Plaintiffs, to fraudulently induce them to invest in the Leverage entities, and to fraudulently misappropriate and obtain control over the funds that Plaintiffs invested with Defendant and the Related Entities.

129.   Defendant and the Related Entities knew at the time they made these false deceptive, and misleading statements and omissions that these statements and omissions were material to Plaintiffs.

130.   Plaintiffs reasonably relied on Defendant's and the Related Entities' statements regarding the Leverage entities in deciding to invest their funds with Defendant and the Related Entities.

131.    As a result of Defendant's and the Related Entities' fraudulent conduct, Plaintiffs have sustained substantial damages and have suffered imminent and irreparable harm.

## COUNT VIII
### (Conversion)

132.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

133.    In the aforesaid contracts and in numerous oral statements, Defendant and the Related Entities agreed that the funds invested by Plaintiffs would be held in segregated accounts for each of Plaintiffs benefit.

134.    Without the consent or authority of any of the Plaintiffs, Defendant and the Related Entities, on information and belief, unlawfully converted property owned by the Plaintiffs, consisting of cash and securities in their respective Leverage entities accounts. Defendant and the Related Entities converted this property for their own benefit, including but not limited to, on information and belief, to purchase real estate in Sullivan County, New York and/or to pay other investors as described herein.

135.    Defendant and the Related Entities converted this property through the aforesaid fraudulent scheme.

136.    Plaintiffs have demanded the return of the wrongfully converted property, but Defendant and the Related Entities have failed and/or refused to return it.

137.    As a result of the conversion, Plaintiffs have sustained substantial damages and have suffered imminent and irreparable harm.

## COUNT IX
### (Negligent Representation)

138.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

139.    At all relevant times, Defendant and the Related Entities owed Plaintiffs a duty to provide correct and accurate information.

140.    The Defendant and the Related Entities provided the following incorrect information and/or misrepresentations to Plaintiffs:

      a.    that Barry was a professional investment manager with a successful track record in managing investments for individuals;

      b.    that the firm's successful track record dated back to approximately 1977;

      c.    that the firm had one of the "best performance records" in the investment management business;

      d.    that the Leverage entities had consistently earned annual returns of between 12.55% and 36% for its investors;

      e.    that investments in the Leverage entities would be "safe";

      f.    that investments in Leverage would earn a guaranteed minimum annual return of 12.55% or in some instances 36%;

      g.    that interest income would be paid quarterly;

      h.    that funds invested in the Leverage entities would be held in a segregated account for each investor;

      i.    that investors would receive quarterly statements evidencing the change in their account over the quarter; and

      j.    that investors in the Leverage entities would be able to liquidate their account upon request.

141.    The Defendant and the Related Entities knew or should have known that the information they were providing to Plaintiffs was incorrect.

142.    Plaintiffs reasonably relied on the incorrect representations and/or misrepresentations to their detriment when making investment decision with Defendant and the Related Entities.

143.    As a result of the negligent misrepresentations, Plaintiffs have sustained substantial damages and have suffered imminent and/or irreparable harm.

## COUNT X
### (Breach of Fiduciary Duty)

144.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

145.    By holding themselves out as a securities broker and/or lender owed a fiduciary duty to Plaintiffs and to treat them with the utmost good faith and diligence.

146.    Defendant and the Related Entities breached their fiduciary duties to Plaintiffs *inter alia* by making the aforesaid material misrepresentations and/or material omissions of fact and by failing to pay Plaintiffs the funds due and owing to them upon due demand, and in most cases ceasing interest payments on routine and ordinary basis arbitrarily and capriciously as was the case.

147.    As a result of the breach of fiduciary duty, Plaintiffs have and will continue to sustain substantial damages, and have and will continue to suffer imminent and irreparable harm.

## COUNT XI
### (Breach of Contract)

148.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

149.    The aforesaid agreements between Plaintiffs and Defendant and the Related Entities, required the Defendant and the Related Entities to pay interest on Plaintiffs' principal deposits at a annual rate between 12.55% for certain investments, or 36% for other investments. Defendant's were also required to return Plaintiffs' principal upon demand, which Defendant's promised but failed and/or refused to do.

150.     Defendant and the Related Entities have breached their contracts with Plaintiffs by *inter alia* failing and/or refusing to return their principal investments and not paying to Plaintiffs all of the required interest.

151.     As a result of the breach of contract, Plaintiffs have and will continue to sustain substantial damages and have and will continue to be imminently and irreparably harmed.

## COUNT XII
**(Breach of Implied Covenants of Good Faith and Fair Dealing)**

152.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth at length herein.

153.     Every contract in the State of New Jersey and New York contains the implied covenants of good faith and fair dealing.

154.     Defendant and the Related Entities have breached the implied covenants of good faith and fair dealing contained in their agreements with Plaintiffs by *inter alia*: (1) making material misrepresentations and/or omissions of fact in order to induce Plaintiffs to invest with Defendant and the Related Entities; and (2) failing to segregate and then improperly converting Plaintiffs' funds for their own use; and (3) failing to return the funds to Plaintiffs upon due demand.

155.     As a result of the breach of the implied covenants of good faith and fair dealing, Plaintiffs have sustained substantial damages and have suffered imminent and irreparable harm.

## COUNT XIII
**(Unjust Enrichment / Constructive Trust)**

156.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

157.     At all relevant times, Defendant and the Related Entities had a confidential or fiduciary relationship with Plaintiffs.

25

158.    Defendant and the Related Entities agreed to hold Plaintiffs' investment deposits in separate accounts, pay a guaranteed annual yield, and to return the full amount of the funds held in Plaintiffs' account upon due demand.

159.    Plaintiffs made investment deposits in the Leverage entities in reliance upon these promises.

160.    Defendant and the Related Entities have been unjustly enriched by obtaining the foregoing investment deposits, enjoying the use of this money for their own benefit, and earning profits thereon.

161.    A constructive trust or equitable lien should be imposed upon all of Defendant and the Related Entities assets in favor of Plaintiffs.

162.    As a result of Defendant's and the Related Entities' unjust enrichment, Plaintiffs have sustained substantial damages and have been imminently and irreparably harmed.

**WHEREFORE**, Plaintiffs demand judgment on all Counts I - XIII against Defendant, Philip G. Barry a/k/a Barry Publications, as follows:

     a.     For compensatory, consequential, and punitive damages in an amount which exceeds Twenty Five million dollars ($25,000,000.00);

     b.     For treble damages and attorney's fees pursuant to all applicable statutes; and

     c.     For attorneys' fees, cost of suit, and such other and further relief as the Court may deem appropriate.

## COUNT XIV
### (11 U.S.C. § 523(a)(2))

163.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

164.     Defendant obtained money or other property from Plaintiffs through a careful and deliberate Ponzi scheme under the guise of financial planning and investing.

165.     The acts and conduct of Defendant constitute the obtaining of money, property, services, or an extension, renewal, or refinancing of credit from Plaintiffs through false pretenses, false representations, or actual fraud, pursuant to 11 U.S.C. § 523(a)(2)(A).

166.     The acts and conduct of Defendant constitute the obtaining of money, property, services, or an extension, renewal, or refinancing of credit from Plaintiffs through the use of written statements which were materially false, and which statements concerned the Defendant's or the Related Entities' financial condition, and at the time Defendant made such written statements, Defendant knew or should have known that Plaintiffs would reasonably rely upon them, pursuant to 11 U.S.C. § 523(a)(2)(B).

167.     Defendant caused these written statements to be made with the intent to deceive Plaintiffs pursuant to 11 U.S.C. § 523(a)(2)(B).

**WHEREFORE**, Plaintiffs demand judgment on Count XIV against Defendant, Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiff's claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorneys' fees, costs, and such other and further relief as the Court may deem appropriate.

## COUNT XV
### (11 U.S.C. § 523(a)(4))

168.     Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

169.    The acts and conduct of Defendant constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny pursuant to 11 U.S.C. § 523(a)(4).

**WHEREFORE**, Plaintiffs demand judgment on Count XIV against Defendant, Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiff's claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorneys' fees, costs, and such other and further relief as the Court may deem appropriate.

### COUNT XVI
**(11 U.S.C. § 523(a)(6))**

170.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

171.    The acts and conduct of Defendant constitute willful and malicious injury by the Defendant to the Plaintiffs and to the property of the Plaintiffs, pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, Plaintiffs demand judgment on Count XIV against Defendant, Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiff's claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorneys' fees, costs, and such other and further relief as the Court may deem appropriate.

### COUNT XVI
**(11 U.S.C. § 523(a)(19))**

172.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

173.    The acts and conduct of Defendant constitute violation of Federal securities laws and/or State securities laws, or any regulation or order issued under such Federal securities laws or State securities laws, pursuant to 11 U.S.C. § 523(a)(19)(A).

174.    The acts and conduct of Defendant constitute common law fraud, deceit, or manipulation in connection with the purchase or sale of securities, pursuant to 11 U.S.C. § 523(a)(19)(B).

**WHEREFORE**, Plaintiffs demand judgment on Count XIV against Defendant, Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiff's claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorneys' fees, costs, and such other and further relief as the Court may deem appropriate.

Dated:  January 30, 2009

ARCHER & GREINER
A Professional Corporation
*Attorneys for Frances Monteleone, Linda Rodriguez, Elyse Scileppi, Frank J. Monteleone, Wendy Monteleone, Margaret Schaeffer Barglow, Raymond Barglow, Pamela Montanaro, Siri Scull, Charles Scull, Robert Wolfson, Mahalia Pugatch, Gene Bianco, and Anita Bianco*


By:  /s/  Alexander Nemiroff
        Alexander Nemiroff (AN7906)
        Archer & Greiner, P.C.
        One Centennial Square
        Haddonfield, NJ  08033
        Tel:  (856) 795-2121
        Fax:  (856) 795-0574
        Email:  anemiroff@archerlaw.com

3813621v1

29