UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| PHILIP G. BARRY<br>a/k/a BARRY PUBLICATIONS, | : | Case No. 08-47352 (DEM) |
| | : | |
| Debtor. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CARL GAMBELLO, CAROLE GAMBELLO,<br>and ADELE DISARMATO, | : | |
| | : | Adv. No. |
| Plaintiffs, | | |
| | : | |
| - against - | | |
| | : | |
| PHILIP G. BARRY<br>a/k/a BARRY PUBLICATIONS | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT TO DETERMINE
## DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523

   Plaintiffs Carl Gambello, Carole Gambello, and Adele Disarmato (collectively,

the "Plaintiffs" or "Gambello Creditors"), by their attorneys, Doar Rieck Kaley & Mack, allege

as follows:

### JURISDICTION AND VENUE

   1.  On October 31, 2008 (the "Petition Date"), the Debtor[1] filed a voluntary

petition for relief under Chapter 11 of the Title 11 of the United States code (the "Bankruptcy

---

[1]  The Debtor in this case appears, *pro se*, as Philip G. Barry a/k/a Barry Publications.  If, in fact, Barry Publications is a legally separate entity existing under the laws of the State of New York, or any other jurisdiction, then to the extent that the Debtor intends Barry Publications to be a debtor in bankruptcy, such pro se representation is not permitted under the laws of this jurisdiction.

Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), under Case No. 08-47352 (DEM) (the "Individual Bankruptcy Case").

2.       On November 20, 2008, Philip Barry LLC, a limited liability company of which the Debtor is the sole member, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, bearing Case no. 1-08-47899 (DEM) (the "Corporate Bankruptcy Case").  The Corporate Bankruptcy Case was dismissed by this Court on January 21, 2009.

3.       This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §1334, Federal Rules of Bankruptcy Procedure 4004(a), 4007, and 7001(6), and 11 U.S.C. §§ 523 and 105(a).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(2)(I).

4.       Venue of this adversary proceeding in this judicial district is appropriate pursuant to 28 U.S.C. § 1409(a), as this proceeding arises in or is related to a case arising under Title 11, which is presently venued in this district as set forth above.

## THE PARTIES

**A.       The Plaintiffs**

5.       Plaintiff Carl Gambello is a citizen of the State of New York who resides at 9323 Shore Road, Brooklyn, New York.

6.       Plaintiff Carole Gambello is a citizen of the State of New York who resides at 9323 Shore Road, Brooklyn, New York.  She is the wife of Carl Gambello.

7.       Plaintiff Adele Disarmato is a citizen of Florida who resides at 1042 Ainslie C in Boca Raton, Florida.   She is the mother of Carole Gambello.

**B.    The Defendant**

8.    On information and belief, defendant Philip G. Barry a/k/a Barry Publications ("Barry" or "Defendant") is a citizen of the State of New York and resides at 7802 Fourth Avenue, Brooklyn, New York.   The defendant frequently provides 477 - 82nd Street, Brooklyn, New York 11209 as his personal address.

**C.    Non-Defendant Related Parties**

9.    On information and belief, The Leverage Group ("Leverage Group") is a New York entity with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

10.    On information and belief, Leverage Option Management Co., Inc. ("Leverage Option Management") is a New York corporation with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

11.    On information and belief, Leverage Management LLC ("Leverage Management") is a New York State limited liability corporation with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

12.    On information and belief, North American Financial ("North American") is a New York entity with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

13.    On information and belief, St. Joseph's Development Corporation ("St. Joseph's") is a New York corporation with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

14.    On information and belief, HK Holdings, LLC ("HK Holdings")  is a New

York State limited liability corporation with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

15.     On information and belief, Philip Barry LLC ("Barry LLC") is a New York State limited liability corporation with its principal place of business at 477 - 82nd Street, Brooklyn, New York 11209.

16.     On information and belief, Barry is a principal, officer, director, or otherwise holds an interest in the foregoing non-Defendant related parties. Although these non-Defendant related parties are defendants in the various District Court actions, which are described in further detail herein, they are not debtors in this Bankruptcy Case and are not defendants in this adversary proceeding. These non-Defendant related parties may be collectively referred to herein as the "Related Entities."

## PROCEDURAL BACKGROUND – DISTRICT COURT

17.     On July 31, 2008, *Gambello et al. v. The Leverage Group*, CV-08-3129 (CPS)(SMG) was filed in the United States District Court for the Eastern District of New York.

18.     On November 17, 2008 and December 18, 2008, the District Court consolidated the *Gambello* action with *Monteleone v. Leverage Group*, CV-08-1986 (CPS)(SMG) and other cases, and a consolidated complaint was thereafter filed.

19.     On January 29, 2009, the District Court entered an Amended Memorandum and Order in the *Gambello* action as well as the consolidated action. The Amended Memorandum and Order granted the *Gambello* plaintiffs' motion for summary judgment against Leverage Group, Leverage Option Management, Leverage Management, and North American Financial, and awarded plaintiff Carl Gambello the sum of $562,891.67,

awarded plaintiff Carole Gambello the sum of $104,483.92, and awarded plaintiff Adele

Disarmato the sum of $12,536.86.

20.     Judgments in favor of the *Gambello* plaintiffs were entered on January 29,

2009.

## FACTUAL BACKGROUND

**A.     Carl Gambello's Investment in Leverage**

21.     In reliance upon defendants' false statements, Carl Gambello provided a

series of personal checks to Barry to invest in the Leverage Group. These checks constituted the

bulk of Mr. Gambello' s retirement savings.

22.     On July 8, 2002, in an introductory meeting between Mr. Gambello and

Barry in Barry's office at 477 82nd Street in Brooklyn, Barry explained that the Leverage Group

engaged in the business of trading in options in publicly-traded securities, which enabled the

Leverage Group to make a profit regardless of whether the underlying security increased or

decreased in value. Barry further represented that the Leverage Group had always earned between

a 12.55% and 17% return during the years of its existence, and that a minimum return of 12.55%

was "guaranteed."

23.     In reliance on these statements, Mr. Gambello gave Barry a check for

$50,000, made to the order of Leverage Option Management (pursuant to Barry's instruction), to

open an account in the Leverage Group, and in return Barry gave Mr. Gambello the contract

attached as Exhibit A to the initial Gambello Complaint in the *Gambello* district court action, see

above ("the initial *Gambello* Complaint").

24.     In that contract, dated July 8, 2002 and signed by Barry as "President,"

defendant and the Related Entities stated:

- that Mr. Gambello's investment would earn a "minimum effective annual yield of 12.55%";

- that this 12.55% return would be "guaranteed for the remainder of calendar year 2002";

- that statements of account would be issued quarterly; and

- that Mr. Gambello's investment would be received into a Leverage Group account numbered 7-081-02.

25.    Mr. Gambello understood from the contract and his discussion with Barry that, among other things, he would have an individual account in Leverage Group (#7-081-02) and would be able to withdraw his money in the future upon request.

26.    In reliance upon the contract and his discussion with Barry, during the quarter ending September 30, 2002 Mr. Gambello made additional investment deposits of $50,000 and $100,000, by personal check made to the order of Leverage Option Management, at Barry's instruction.

27.    By letter mailed and dated December 2002, the Defendant and the Related Entities informed Mr. Gambello that the guaranteed minimum effective annual yield of the fund for calendar year 2003 would again be 12.55%.  The letter represented that Leverage Group would "continue to be the absolute safest place for your money to grow," and that 2003 would be Leverage's 25th year in existence.

28.    Beginning with the quarter ending September 30, 2002 and continuing thereafter for every quarter through the end of 2007, the Defendant and the Related Entities

mailed Quarterly Statements to Mr. Gambello reflecting that his investment in Leverage Group was earning the guaranteed 12.55% annual return, and that his investment was growing accordingly, as investment gains were reinvested in his account

29.     In reliance upon the foregoing statements, including the representations made in the Quarterly Statements, Mr. Gambello made further investment deposits of $2,500 (on January 6, 2003), $5,000 (May 19, 2003), $10,000 (January 8, 2004), $8,500 (July 2, 2004), $82,149.27 (July 30, 2004), $6,392 (December 17, 2004), $26,554 (November 29, 2005), and $38,665 (January 30, 2006), by personal check made to the order of Leverage Option Management or to the order of Leverage Group, at Barry's instruction.

30.     Around the end of the 2006 calendar year, Mr. Gambello received a letter from Defendant, dated December 2006, stating that the minimum effective annual yield for calendar year would again be 12.55%, and reaffirming that "we" have "one of the best performance records in the investment management business."

31.     Mr. Gambello has not received a Quarterly Statement since the Statement for the quarter ending June 2007, which reflects a closing balance of $500,000.

**B.**     **Plaintiff Carole Gambello's Investment in Leverage**

32.     In reliance upon the Defendant's and the Related Entities' false statements, including those alleged above and the statements made to Carl Gambello, Carole Gambello provided a series of personal checks to defendants to invest in Leverage Group.

33.     On March 16, 2004, in an introductory meeting between Mrs. Gambello and Barry in Barry's office, Barry claimed that the Leverage Group was a sound company that had achieved excellent returns for its investors for more than 20 years.  In reliance upon these

and other assertions, Mrs. Gambello provided Barry a personal check in the amount of $10,000 to open an account in the Leverage Group, and Barry gave Mrs. Gambello the contract attached as Exhibit D to the Initial *Gambello* Complaint.

34.     In that contract, dated March 16, 2004 and signed by Barry as "President," the Defendant and the Related Entities stated:

- that Mrs. Gambello's investment would earn a "minimum effective annual yield of 12.55%";

- that this 12.55% return would be "guaranteed for the remainder of calendar year 2004";

- that statements of account would be issued quarterly; and

- that Mrs. Gambello's investment would be received into a Leverage account numbered 3-161-04.

35.     Mrs. Gambello understood from the contract and her discussion with Barry that, among other things, she would have an individual account in the Leverage Group (#3-161-04) and would be able to withdraw her money in the future upon request.

36.     Beginning with the quarter ending March 2004 and continuing thereafter for every quarter through the end of 2007, the Defendant and the Related Entities mailed to Mrs. Gambello Quarterly Statements reflecting that her investment in the Leverage Group was yielding the guaranteed 12.55% annual return and that her investment was growing accordingly, as investment gains were reinvested in her account.

37.     In reliance upon the contract, the Quarterly Statements, and her discussion with Barry when she opened her account, Mrs. Gambello made additional investment deposits of

$10,000 (August 13, 2004), $5,000 (April 13, 2006), $40,000 (August 25, 2006), and $10,000 (April 21, 2007), by personal check made payable to Leverage Option Management, at Barry's instruction.

38.    The most recent Quarterly Statement received by Mrs. Gambello, for the quarter ending March 31, 2008, reflects that her account had a closing balance of $97,207.07.

**C.    Plaintiff Adele Disarmato's Investment in Leverage**

39.    In reliance upon Barry's false statements, plaintiff Adele Disarmato, in February 1996, provided a series of checks to the Defendant and the Related Entities to invest in the Leverage Group.

40.    In or about February 1996, Disarmato spoke with Barry on the telephone concerning investing in Leverage. Based upon what Barry claimed about Leverage Group and its returns, Disarmato mailed Barry a personal check in the amount of $1,000 to open an account in Leverage Group, and Barry mailed Disarmato the contract attached as Exhibit F to the initial *Gambello* Complaint.

41.    In that contract, dated February 22, 1996 and signed by Barry as "President," the Defendant and the Related Entities stated:

- that Disarmato's investment would earn a minimum effective annual yield of 12.55%;

- that this 12.55% return would be "guaranteed" for the remainder of calendar year 1996;

- that statements of account would be issued quarterly; and

- that Disarmato's investment would be received into a Leverage Group

-9-

account numbered 2-221-96.

42.    Disarmato understood from the contract and her discussion with Barry that, among other things, she would have an individual account in Leverage Group (#2-221-96) and would be able to withdraw her money in the future upon request.

43.    Beginning with the quarter ending March 1996 and continuing thereafter for every quarter through the end of 2007, the Defendant and the Related Entities mailed to Disarmato Quarterly Statements reflecting that her investment in Leverage Group was yielding the guaranteed 12.55% annual return and that her investment was growing accordingly, as investment gains were reinvested in her account.

44.    In reliance upon the contract, the Quarterly Statements, and her discussion with Barry when she opened the account, Disarmato mailed Barry additional investment deposits of $200 (January 22, 1997), $5,000 (February 10, 1997), $1,000 (July 31, 1997), and $2,500 (November 29, 2000), by personal check made to the order of Leverage Option Management, at Barry's instruction.

45.    The most recent Quarterly Statement received by Disarmato, for the quarter ending March 31, 2008, reflects that her account had a closing balance of $10,904.32.

**D.    The Discovery of the Fraud.**

46.    In December 2007 or January 2008, several investment-gain checks issued by the Defendant and the Related Entities to Carl Gambello, drawn on the account of Leverage Management LLC and amounting to $12,600, were returned as unpaid.  At least one of these bounced checks was returned because the bank account on which the check was drawn had been closed.

-10-

47.     Mr. Gambello thereupon met personally with Barry to demand the liquidation of his account, which then totaled $500,000, as reflected in the Quarterly Statements that Mr. Gambello had received.  Barry replied that he was unable to comply with Mr. Gambello's demand, but that he hoped he would be able to do so in the near future and urged Mr. Gambello to "be patient."  Barry further stated that the reason the investment-gain checks had bounced was because of confusion created by Leverage Group's transfer of its checking account from one bank to another.

48.     In February 2008, Carole Gambello learned that Adele Disarmato (Mrs. Gambello's mother) had not received her investment-gain check for the fourth quarter of 2007, and promptly telephoned Barry on her mother's behalf to demand immediate issuance of the missing check and also that defendants pay her mother $3,000 in partial withdrawal from the account.  Barry stated that the failure to issue the investment-gain had been the result of his being "involved in tax time," and that he would provide both checks (i.e., the missing investment-gain check and the $3,000 partial withdrawal) soon.

49.     Around this same time, Mrs. Gambello learned of the bounced investment-gain checks sent to her husband Carl, see above.

50.     Barry subsequently mailed to Disarmato a check for the quarterly investment-gain owed to Disarmato (that check later bounced), but failed to provide a check for the $3,000 partial withdrawal that had been demanded. Barry also failed to send the investment-gain check due Disarmato for the first quarter of 2008.  He likewise failed to send Mr. Gambello's investment-gain payment for that quarter.  He also failed to provide any Quarterly Statements at all to either Mr. Gambello, Mrs. Gambello, or Disarmato.

51.    Carole Gambello telephoned Barry about these failures in May 2008. In response, Barry stated that he had "been busy with tax stuff," and would attend to all of these matters right away.

52.    Soon thereafter, concerned about the security of her mother's investment, her husband's investment, and her own personal investment in Leverage Group, Mrs. Gambello telephoned Barry to schedule a meeting.

53.    On June 6, 2008, Mr. and Mrs. Gambello met with Barry at his office to ascertain the status of their investments in Leverage Group. During the meeting, Barry offered a series of inadequate explanations concerning Leverage Group and his repeated failures to make investment-gain payments, which led plaintiffs to demand that they be allowed to withdraw their accounts in full. Barry responded that he was unable to do so, and would not be able to do so until a real estate venture of his in Sullivan County, New York (characterized as Leverage Group's "backup plan") was allowed to go forward by local authorities. Barry also admitted that he had honored at least one other investor's request to withdraw all or a portion of that investor's account. The decision was made to meet again in one month's time.

54.    On July 18, 2008, Carl and Carole Gambello met again with Barry to demand withdrawal of their accounts, as well as Disarmato's account. Barry acknowledged the amounts owed to the plaintiffs but responded that their money was not "available," and would not "be available" until after Leverage had come current on the investment-gain checks that were owed to Mr. Gambello and Disarmato, which Barry estimated would take four months' time. When asked to provide some documentation reflecting how their money had been invested, Barry declined, stating that he could not show them any records concerning the relevant option-trading

because doing so would jeopardize Leverage Group's status as a "private group." While acknowledging that he had recently purchased the building in which his office was located, he claimed he could not borrow against it because it was "mortgaged to the top." Barry again urged Carl and Carole Gambello to be patient, stating that recent discovery of natural gas deposits under his Sullivan County property meant that Leverage's "backup plan" would reach fruition.

55. To date, the Defendant and the Related Entities have not complied with Carl and Carole Gambello's requests to withdraw their money from their accounts. Instead, in an apparent attempt to lull the Gambello plaintiffs into forbearing, Barry wire-transferred the sum of $2,000 into Carl Gambello's money market account.

56. The Defendant and the Related Entities have not only failed to comply with Mr. Gambello's request to liquidate his account, but they have also failed to pay the investment gain owed him for the 2008 calendar year and the partial year 2009, and also failed to replace the $12,600 in investment-gain checks for the fourth quarter of 2007 that bounced, see above.

57. With regard to Disarmato's account, the Defendant and the Related Entities only recently complied with the demand that she receive a withdrawal of $3,000 from her Leverage Group account (see above). The Defendant and the Related Entities have failed, however, to pay the investment gain owed to her for calendar year 2008 and the partial year 2009. The Defendant and Related Entities also owe Disarmato the investment gain for the last quarter of 2007; the check that Defendant provided her for that quarter's investment gain, in the amount of $417.13, drawn on a Leverage Management LLC checking account, bounced. Barry later provided a replacement check, which also bounced.

58.    Currently, the Gambello plaintiffs are due and owed the following

amounts:

- Carl Gambello is due and owed his account principal of $500,000, see above, together with $12,600 in investment-gain checks for the fourth quarter of 2007, see above, and the investment-gain checks owed for the 2008 calendar year and the partial year 2009 at the guaranteed annual yield rate of 12.55% (amounting to $15,000 per quarter), less the $2,000 that Barry wire-transferred;

- Carole Gambello is due and owed her account principal of $97,207.07, see above, together with the investment gain for the 2008 calendar year and the partial year 2009 at the guaranteed annual yield rate of 12.55%; and

- Adele Disarmato is due and owed her account principal of $10,904.32, see above, together with the investment-gain checks owed for the 2008 calendar year 2008 and the partial year 2009 at the guaranteed annual yield rate of 12.55%, and the sum of $417.13 owed for the last quarter of 2007, see above.

## COUNT I
### (Violation of Federal Securities Laws)

59.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

60.     The options in which Defendant and the Related Entities traded or purported to trade on Plaintiffs' behalf are a "security" or "securities" within the meaning of Sections 3(a)(10) and 10(b) of the Securities Exchange Act, 15 U.S.C. sections 78c(a)(l0), 78j(b), and S.E.C. Rule l0b-5.

61.     Defendant and the Related Entities, directly and indirectly, singly and in concert, knowingly or recklessly, by use of the means and instrumentality of interstate commerce or of the mails, in the offer or sale, and in connection with the purchase or sale, of securities, have, *inter alia,* (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchases of securities.

62.     In furtherance of the securities fraud, Defendant and the Related Entities have made several misrepresentations, including but not limited to the following:

a.     that Barry was a professional investment manager with a successful track record in managing investments for individuals;

b.     that the firm's successful track record dated back to approximately 1977;

-15-

    c.    that the firm had one of the best performance records in the investment management business;

    d.    that the Leverage Group had consistently earned annual returns of at least 12.55% for its investors;

    e.    that investments in the Leverage Group would be "safe";

    f.    that investments in the Leverage Group would earn a guaranteed minimum annual return of 12.55%;

    g.    that interest income would be paid quarterly;

    h.    that funds invested in the Leverage Group would be held in a segregated account for each investor;

    i.    that investors would receive quarterly statements evidencing the change in their account over the quarter; and

    j.    that investors in the Leverage Group would be able to liquidate their account upon request.

63.    These representations were material, and the Defendant and the Related Entities knew or should have known that the material misrepresentations were false or misleading.

64.    By reason of the acts, omissions, practices and courses of business set forth in this Complaint, the Defendant and the Related Entities have violated the securities laws of the United States, including but not limited to, Sections 3(a)(10) and 10(b) of the Securities Exchange Act, 15 U.S.C. sections 78c(a)(l0), 78j(b), and S.E.C. Rule l0b-5.

65.    Plaintiffs reasonably relied on Defendant's and the Related Entities'

misrepresentations regarding Leverage, the Defendant, and the Related Entities, in deciding to invest their funds.

66.     As a result of the foregoing, Plaintiffs have sustained substantial damages and have been irreparably harmed.

## COUNT II
### (Federal RICO – Violation of 18 U.S.C. 1962(c))

67.     Plaintiffs reassert and reallege the foregoing allegations as if fully set forth herein.

68.     At all times relevant to this complaint, the Defendant and the Related Entities were "persons" within the meaning of 18 U.S.C. section 1961(3).

69.     At all times relevant to this complaint, the Defendant and Leverage Option Management, North American, Leverage Management, St. Joseph's, and HK Holdings (the "RICO Defendants"), directly or indirectly maintained an interest in or participated in the operation of the Leverage Group, which is an "enterprise" within the meaning of 18 U.S.C. section 1961(4).

70.     As set forth more fully above, the foregoing RICO Defendants corrupted the Leverage Group and caused Plaintiffs damage through a pattern of racketeering activity.  At all times relevant to this complaint, the foregoing RICO Defendants conducted or participated, directly or indirectly, in the operation and management of the Leverage Group through a pattern of racketeering activity within the meaning of 18 U.S.C. section 1961(1) and (5) and section 1962(c).  This pattern of racketeering activity entailed at least two predicate acts of racketeering activity by the foregoing RICO Defendants.

-17-

71.    The aforementioned pattern of racketeering consisted of a multitude of acts that are indictable under 18 U.S.C. sections 1341, 1343 and 1346 and are within the scope of 18 U.S.C. sections 1961(a)(A) and (1)(B).  As set out more fully herein, the commission of at least two of those related predicate acts over the last 10 years constituted a continuous and related pattern of racketeering activity as defined in 18 U.S.C. sections 1961(1) and (5).

72.    As part of and in furtherance of the fraudulent schemes and artifices described aforesaid, the RICO Defendants made repeated use of; or had reason to believe that others would use, the U.S. Postal Service, interstate overnight couriers, and the interstate wires to transmit various documents, including without limitation the Quarterly Statements, contracts, letters and investment-deposit checks referenced above (the "Transmissions")..

73.    Each Transmission constituted either the transmittal by means of wire communication in interstate commerce of signals, sounds or writings; the use of the U.S. Postal service; or the use of interstate overnight couriers for the purpose of executing or in connection with the aforementioned schemes and artifices to defraud.  The foregoing RICO Defendants knew or had reason to believe that these transmissions were in furtherance of advancing the aforesaid corrupt enterprise or were incidental to an essential part of the aforesaid corrupt enterprise.

74.    The RICO Defendants made or caused these transmissions to be made with the specific intent of defrauding Plaintiffs and other investors and potential investors in the Leverage Group.   Each of these Transmissions furthered the aforementioned schemes and artifices to defraud, which were intended to and did proximately cause injury to Plaintiffs and others in their business and property.  Those acts constituted offenses indictable as crimes under

the "mail fraud" and "wire fraud" statutes, 18 U.S.C. sections 1341, 1343 and 1346.

75.    Plaintiffs reasonably relied upon the oral and written statements made to them by the foregoing RICO Defendants in connection with the aforementioned schemes or artifices to defraud.

76.    As a result of the foregoing, Plaintiffs have sustained substantial damages and suffered irreparable harm.

**COUNT III**
**(Federal RICO Conspiracy – Violation of 18 U.S.C. § 1962(d))**

77.    Plaintiffs repeat and reallege the foregoing allegations as if the same were fully set forth at length herein.

78.    Since at least 1988 through and including the present, the RICO Defendants unlawfully and willfully combined, conspired, confederated and agreed between and among each other to violate 18 U.S.C. section 1962(c), i.e. to conduct and participate, directly and indirectly, in the affairs of the Leverage Group through a pattern of racketeering, all in violation of 18 U.S.C. section 1962(d).

79.    As part of this conspiracy, each of the foregoing RICO Defendants personally agreed to commit and in fact committed two or more predicate racketeering acts within the last 10 years and agreed to conduct and in fact conducted the affairs of the Leverage Group through a pattern of racketeering activity in violation of 18 U.S.C. section 1962(c).

80.    As a result of the foregoing, Plaintiffs have sustained substantial damages and have been irreparably harmed.

## COUNT IV
### (Common Law Fraud)

81.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

82.    The Defendant and the Related Entities made numerous false and misleading statements to Plaintiffs, both orally and in writing. These false and misleading statements upon which the Defendant and the Related Entities expected Plaintiffs to rely, include, but are not limited to the following:

a.    that Barry was a professional investment manager with a successful track record in managing investments for individuals;

b.    that the firm's successful track record dated back to approximately 1977;

c.    that the firm had one of the best performance records in the investment management business;

d.    that the Leverage Group had consistently earned annual returns of at least 12.55% for its investors;

e.    that investments in the Leverage Group would be "safe";

f.    that investments in the Leverage Group would earn a guaranteed minimum annual returns of at least 12.55%;

g.    that interest income would be paid quarterly;

h.    that funds invested in the Leverage Group would be held in a segregated account for each investor;

i.     that investors would receive quarterly statements evidencing the

change in their account over the quarter; and

j.     that investors in the Leverage Group would be able to liquidate

their account upon request.

83.     Additionally, upon information and belief, Defendant and the Related

Entities fraudulently converted Plaintiffs' funds and used them to purchase numerous properties

in Sullivan County, New York and other New York locations.

84.     Defendant and the Related Entities acted with the intention to deceive and

mislead the Plaintiffs, to fraudulently induce them to invest in the Leverage Defendants, and to

fraudulently misappropriate and obtain control over the funds that Plaintiffs invested with the

Defendant and the Related Entities.

85.     Defendant and the Related Entities knew at the time they made these false

deceptive, and misleading statements and omissions that these statements and omissions were

material to Plaintiffs.

86.     Plaintiffs reasonably relied on Defendant's and the Related Entities'

statements regarding the Leverage Group in deciding to invest their funds with Defendant and the

Related Entities.

87.     As a result of Defendant's and the Related Entities' fraudulent conduct,

Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## **COUNT V**
### **(Conversion)**

88.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth

herein.

89.     In the aforesaid contracts and in numerous oral statements, the Defendant and the Related Entities agreed that the funds invested by Plaintiffs would be held in segregated accounts for each Plaintiff's benefit.

90.     Without the consent or authority of any of the Plaintiffs, Defendant and the Related Entities, on information and belief, unlawfully converted property owned by the Plaintiffs, consisting of cash and securities in their respective Leverage Group accounts. Defendant and the Related Entities converted this property for their own benefit, including but not limited to, on information and belief, to purchase real estate in Sullivan County, New York and/or to pay other investors as described herein.

91.     Defendant and the Related Entities converted this property through the aforesaid fraudulent scheme.

92.     Plaintiffs have demanded the return of the wrongfully converted property, but Defendant and the Related Entities have failed and/or refused to return it.

93.     As a result of the conversion, Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## COUNT VI
### (Negligent Representation)

94.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

95.     At all relevant times, Defendant and the Related Entities owed Plaintiffs a duty to provide correct and accurate information.

96.    The Defendant and the Related Entities provided the following incorrect information and/or misrepresentations to Plaintiffs:

a.    that Barry was a professional investment manager with a successful track record in managing investments for individuals;

b.    that the firm's successful track record dated back to approximately 1977;

c.    that the firm had one of the "best performance records" in the investment management business;

d.    that the Leverage Group had consistently earned annual returns of at least 12.55% for its investors;

e.    that investments in the Leverage Group would be "safe";

f.    that investments in the Leverage Group would earn a guaranteed minimum annual return of at least 12.55%;

g.    that interest income would be paid quarterly;

h.    that funds invested in the Leverage Group would be held in a segregated account for each investor;

i.    that investors would receive quarterly statements evidencing the change in their account over the quarter; and

j.    that investors in the Leverage Group would be able to liquidate their account upon request.

97.    The Defendant and the Related Entities knew or should have known that the information they were providing to Plaintiffs was incorrect.

-23-

98.     Plaintiffs reasonably relied on the incorrect representations and/or misrepresentations to their detriment when making investment decisions with regard to their investment in the Leverage Group.

99.     As a result of the negligent misrepresentations, Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## COUNT VII
### (Breach of Fiduciary Duty)

100.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

101.     Defendant and the Related Entities owed a fiduciary duty to Plaintiffs and were under an obligation to treat the Plaintiffs with the utmost good faith and diligence.

102.     This duty arose from the fact that the Defendant held himself out as an experienced investment adviser and promised to manage and invest funds for Plaintiffs' benefit; the Defendant held himself out and agreed to manage Leverage Group for the benefit of the investors, including the Plaintiffs; and the Defendant and the Related Entities had access to the books and records of the Leverage Group that were not accessible to the investors, including the Plaintiffs.

103.     Defendant and the Related Entities breached their fiduciary duties to Plaintiffs *inter alia* by making the aforesaid material misrepresentations and/or material omissions of fact and by failing and refusing to pay Plaintiffs the funds due and owing to them.

104.     As a result of the breach of fiduciary duty, Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## COUNT VIII
### (Breach of Contract)

105.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

106.    The aforesaid agreements between Plaintiffs on the one hand and Defendant and the Related Entities on the other hand, required the Defendant and the Related Entities to pay interest on Plaintiffs' principal deposits at a annual rate of 12.55%.  Defendant and the Related Entities were also required to return Plaintiffs' principal upon demand, which Defendant and the Related Entities promised but failed and/or refused to do.

107.    Defendants and the Related Entities have breached their contracts with Plaintiffs by *inter alia* failing and/or refusing to return their principal investments and not paying to Plaintiffs all of the required interest.

108.    As a result of the breach of contract, Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## COUNT IX
### (Breach of Implied Covenants of Good Faith and Fair Dealing)

109.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth at length herein.

110.    Every contract in the State of New York contains the implied covenants of good faith and fair dealing.

111.    Defendant and the Related Entities have breached the implied covenants of good faith and fair dealing contained in their agreements with Plaintiffs by *inter alia*: (1) making material misrepresentations and/or omissions of fact in order to induce Plaintiffs to invest with

Defendant and the Related Entities; (2) failing to segregate and then improperly converting Plaintiffs' funds for their own use; and (3) failing to return the funds to Plaintiffs upon due demand.

112.    As a result of the breach of the implied covenants of good faith and fair dealing, Plaintiffs have sustained substantial damages and have suffered irreparable harm.

## COUNT X
### (Unjust Enrichment/Constructive Trust)

113.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

114.    At all relevant times, Defendant and the Related Entities had a confidential or fiduciary relationship with Plaintiffs.

115.    Defendant and the Related Entities agreed to hold Plaintiffs' investment deposits in separate accounts, pay a guaranteed annual yield, and to return the full amount of the funds held in Plaintiffs' account upon due demand.

116.    Plaintiffs made investment deposits in the Leverage Group in reliance upon these promises.

117.    Defendant and the Related Entities have been unjustly enriched by obtaining the foregoing investment deposits, enjoying the use of this money for their own benefit, and earning profits thereon.

118.    A constructive trust or equitable lien should be imposed upon all of the Defendant's and the Related Entities' assets in favor of Plaintiffs.

119.    As a result of the Defendant and the Related Entities' unjust enrichment,

-26-

Plaintiffs have sustained substantial damages and have suffered irreparable harm.

**WHEREFORE**, Plaintiffs demand judgment on all Counts I - X against Defendant as follows:

a.   For compensatory, consequential, and punitive damages in an amount which exceeds Twenty Five million dollars ($25,000,000.00);

b.   For treble damages and attorney's fees pursuant to all applicable statutes; and

c.   For attorneys' fees, cost of suit, and such other and further relief as the Court may deem appropriate.

## <u>COUNT XI</u>
### (11 U.S.C. § 523(a)(2))

120.   Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

121.   Defendant obtained money or other property from Plaintiffs through a careful and deliberate Ponzi scheme under the guise of financial planning and investing.

122.   The acts and conduct of Defendant constitute the obtaining of money, property, services, or an extension, renewal, or refinancing of credit from Plaintiffs through false pretenses, false representations, or actual fraud, pursuant to 11 U.S.C. § 523(a)(2)(A).

123.   The acts and conduct of Defendant constitute the obtaining of money, property, services, or an extension, renewal, or refinancing of credit from Plaintiffs through the use of written statements which were materially false, and which statements concerned the Defendant's or the Related Entities' financial condition, and at the time Defendant made such

written statements, Defendant knew or should have known that Plaintiffs would reasonably rely upon them, pursuant to 11 U.S.C. § 523(a)(2)(B).

124.    Defendant caused these written statements to be made with the intent to deceive Plaintiffs, pursuant to 11 U.S.C. § 523(a)(2)(B).

**WHEREFORE**, Plaintiffs demand judgment on Count XI against Defendant Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiffs' claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorney's fees, costs, and such other and further relief as the Court may deem appropriate.

## COUNT XII
### (11 U.S.C. § 523(a)(4))

125.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

126.    The acts and conduct of Defendant constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, pursuant to 11 U.S.C. § 523(a)(4).

**WHEREFORE**, Plaintiffs demand judgment on Count XII against Defendant Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiffs' claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorney's fees, costs, and such other and further relief as the Court may deem appropriate.

## COUNT XIII
## (11 U.S.C. § 523(a)(6))

127.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

128.    The acts and conduct of Defendant constitute willful and malicious injury by the Defendant to the Plaintiffs and to the property of the Plaintiffs, pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, Plaintiffs demand judgment on Count XIII against Defendant Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiffs' claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorney's fees, costs, and such other and further relief as the Court may deem appropriate.

## COUNT XIV
## (11 U.S.C. § 523(a)(19))

129.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

130.    The acts and conduct of Defendant constitute violation of Federal and/or State securities laws, or any regulation or order issued under such Federal securities laws or State securities laws, pursuant to 11 U.S.C. § 523(a)(19)(A).

131.    The acts and conduct of Defendant constitute common law fraud, deceit, or manipulation in connection with the purchase or sale of securities, pursuant to 11 U.S.C. § 523(a)(19)(B).

**WHEREFORE**, Plaintiffs demand judgment on Count XIV against Defendant Philip G. Barry a/k/a Barry Publications by entering judgment for the amount of funds and value of assets misappropriated by Defendant, and excepting the Plaintiffs' claims against Defendant in the Individual Bankruptcy Case, or such portion thereof as the Court deems just, from discharge, together with attorney's fees, costs, and such other and further relief as the Court may deem appropriate.

Dated:          New York, New York
                January 30, 2009

                              DOAR RIECK KALEY & MACK
                              *Attorneys for Plaintiffs*


                     By:    /s/ Edward Scarvalone
                            EDWARD SCARVALONE (ES-4880)
                            217 Broadway, Suite 707
                            New York, New York 10007
                            Tel. (212) 619-3730
                            Fax (212) 962-5037
                            escarvalone@doarlaw.com